IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NASHIKAI IANSCOLI | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security | : | No: 10-1200 |

<u>**REPORT AND RECOMMENDATION**</u>

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE                    August 24, 2011

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's

application for supplemental security income ("SSI") and disability insurance benefits

("DIB") under Titles II and XVI the Social Security Act.  For the reasons that follow, I

find that the Commissioner's final decision does not contain substantial evidence to

support the findings of fact and conclusions of law of the Administrative Law Judge

("ALJ").  Therefore, I recommend that the case be remanded to the Commissioner for

further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**I.    PROCEDURAL HISTORY**

Plaintiff protectively filed for DIB and SSI on June 14, 2007, alleging disability as

of January 12, 2007, due to heart problems, cirrhosis, hepatitis C, irritable bowel

syndrome, acid reflux, allergies, tendinitis in both wrists, and blurred vision.  <u>Tr.</u> at 132.

The application was denied initially on September 26, 2007.  <u>Id.</u> at 128.  Plaintiff

requested an administrative hearing on November 30, 2007.  <u>Id.</u> at 81-82.

The ALJ convened a pre-hearing conference on May 22, 2008, to inform Plaintiff of her right to have an attorney, and scheduled her administrative hearing for July 15, 2008. Tr. at 58-67, 96. Plaintiff again appeared without counsel on July 15, 2008, at which time the ALJ proceeded with the hearing and took testimony from Plaintiff and a vocational expert ("VE"). Id. at 27-57. In a decision dated October 17, 2008, the ALJ denied Plaintiff's claims, finding that Plaintiff was not disabled within the Act's meaning because she retained the residual functional capacity ("RFC") to perform her past relevant work. Id. at 16-24.

Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, and obtained the representation of an attorney. Tr. at 8-12. On January 9, 2010, appointed counsel submitted argument to the Appeals Council in support of Plaintiff's request for review, as well as a two-page document from Horizon House where Plaintiff had received mental health treatment. Id. at 169-70, 334-36. On January 28, 2010, the Appeals Council denied Plaintiff's request for review. Id. at 1-4. Therefore, the decision of the ALJ is the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1472.

Plaintiff commenced this action on March 19, 2010, and submitted the present motion for summary judgment on June 20, 2010. See Doc. 8. Defendant filed a Response to Request for Review on July 22, 2010, see Doc. 9, after which the matter was referred to the undersigned for a report and recommendation.

## II.   __LEGAL STANDARD__

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); Richardson v. Perales, 402 U.S. 389 (1971); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate," and must be "more than a mere scintilla."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 118 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  The court has plenary review of legal issues.  Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).

To prove a disability, a claimant must demonstrate "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

1.   Whether the claimant is currently engaged in substantial gainful activity;

2.   If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;

3

3.     If so, whether, based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.     If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the RFC to perform his past work; and

5.     If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Allen v. Barnhart, 417 F.3d 396, 401 n.2 (3d Cir. 2005) (quoting Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000)) (internal citations omitted); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four of this test, while the Commissioner bears the burden of proof at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.    FACT RECORD AND THE ALJ'S DECISION

Plaintiff was born on September 7, 1952.  Tr. at 104.  She was 54 years old at the time of the alleged onset of her disability, and 55 years old at the time of the July 28, 2008, administrative hearing.  Id. at 33, 56.  Plaintiff was evicted from her home on May 2, 2008, and was living in a homeless shelter at the time of her administrative hearing.  Id.

4

at 32-33, 39.[1]  She was estranged from an abusive husband and reported having one

"distant" child, but she lived alone and did not take care of anyone else.  Id. at 140, 287.

Plaintiff completed high school and entered business school, but did not obtain a college

degree.  Id. at 33.  She had past relevant work as an accounting clerk, which she

performed for more than seventeen years until January 12, 2007, her alleged disability

onset date.  Id. at 34.  She explained that the job entailed lifting heavy "archive boxes" of

accounting records, and required her to stoop, bend and file.  Id. at 34-35.

Plaintiff testified that her employment ended when she was placed on permanent

medical leave for a variety of health problems.  Tr. at 35.  In a function report completed

on August 13, 2007, Plaintiff indicated that she stayed at home and cared for herself,

including paying bills and taking her medication.  Id. at 140-42.  She indicated that she

could go out alone, but not for long, could walk and use public transportation, go

shopping, and attend church.  Id. at 142-43.  She also indicated that she could follow

written instructions "fine," get along with people, handle changes in routine "pretty well,"

and had no unusual behavior or fears.  Id. at 144-45.

### A.   Plaintiff's Medical Evidence

On July 20, 2006, Besma Haque-Samdani,. M.D., a gastroenterologist, evaluated

Plaintiff in response to a liver biopsy performed in May 2006, which indicated the

_____

[1] Plaintiff's unstable housing situation subsequently improved, as indicated by a letter from Plaintiff's counsel dated August 5, 2009, informing the Appeals Council that Plaintiff had moved into an apartment.  See Tr. at 7.

presence of hepatitis C[2] and bridging fibrosis.[3]  Tr. at 179, 182-84.  Dr. Haque-Samdani

described Plaintiff's hepatitis C as "Stage 3/4" and "advanced."  Id. at 179.  Plaintiff

denied any abdominal-related complaints, including nausea, vomiting, pain, fever and

chills.  Id.  The doctor recommended treatment with Interferon and Ribavirin to eradicate

the hepatitis virus.  Id. at 180.

On October 2, 2006, Plaintiff underwent a CAT scan of her abdomen.  Tr. at 221-

22.  The physician who interpreted the CAT scan stated, "No findings to account for the

patient's complaint of abdominal pain."  Id. at 221.

During an office visit on October 10, 2006, Rita Carabello, D.O., Plaintiff's

treating physician, diagnosed Plaintiff with a variety of physical ailments, including

hepatitis C, irritable bowel syndrome, diarrhea, reflux disease, and allergic rhinitis.  Tr. at

215.  The doctor also diagnosed Plaintiff with anxiety and depression for the first time.

Id.  Dr. Carabello repeated these diagnoses, including anxiety and depression, during

follow-up visits on December 7, 2006, and June 11, 2007.  Id. at 217, 231.

On January 26, 2007, Victor J. Navarro, M.D., conducted a consultative

examination of Plaintiff.  Tr. at 196-97.  Plaintiff reported to Dr. Navarro that she did not

---

[2]Hepatitis C is a viral disease of the liver caused by the hepatitis C virus, which causes inflammation.  Dorland's Illustrated Medical Dictionary, 31st ed. (2007) ("DIMD"), at 856.  It is sometimes referred to as "HVC" in the medical record.

[3]Fibrosis refers to the formation of fibrous tissue.  DIMD at 712.  Bridging fibrosis is an area of liver fibrosis that bridges adjacent portal areas to central veins due to excess deposition of collagen.  See http://www.drugs.com/dict/bridges-hepatic-fibrosis.html (last visited 08/18/l1).

proceed with the with Interferon and Ribavirin treatment because she had been told that she would likely not respond. <u>Id.</u> at 196. Plaintiff also reported a hospitalization for a rapid heart beat while shopping, and that the episode was attributed to the allergy medication Allegra. <u>Id.</u> In addition to Allegra, her medications included Zantac,[4] Metoprolol[5] and Lomotil.[6] <u>Id.</u> Upon examination, Dr. Navarro reported Plaintiff's chest was clear, her heart sounds were regular, her abdomen was soft and normal, she had no lower extremity edema, and her pulses were intact. <u>Id.</u> at 197. During follow-up visits in February and March 2007, Dr. Navarro gave Plaintiff the treatment option of Interferon and Ribavirin or a clinical trial using Interferon with newer agents, and Plaintiff indicated she would like to consider the trial. <u>Id.</u> at 198, 200. On March 22, 2007, in response to Plaintiff's report of a history of depression, Dr. Navarro recommended that she seek psychiatric counsel or begin anti-depressant medication prior to embarking on the recommended Interferon therapy. <u>Id.</u> at 200.

On March 5, 2007, Brian Fedgchin, M.D., a cardiologist, evaluated Plaintiff's heart following the episode of rapid heart beat that led to her hospitalization. <u>Tr.</u> at 193-94. Plaintiff's cardiovascular examination showed a normal EKG and sinus rhythm with

---

[4]Zantac is indicated for the treatment of ulcers and reflux disease. <u>Physician's Desk Reference</u>, 65th ed. (2011) ("<u>PDR 2011</u>") at 1635.

[5]Metaprolol is a beta-blocker used in the treatment of angina (chest pain) and hypertension. <u>See</u> <u>http://drugs.com/metaprolol.html</u> (last visited Aug. 15, 2011).

[6]Lotomil is indicated for the treatment of diarrhea and other intestinal and bladder issues. <u>See</u> <u>http://www.drugs.com/mtm/lotomil.ntml</u> (last visited Aug. 15, 2011).

no murmurs.  Id.  An echocardiogram revealed normal chamber sizes, wall thickness, and ventricular functions.  Id. at 194.  Dr. Fedgchin concluded that Plaintiff had a structurally normal heart and no further irregular heartbeats, but recommended that she remain on Metoprolol and wear a cardiac event monitor to document any further arrhythmias.  Id.

On June 11, 2007, Dr. Carabello prepared a functional assessment of Plaintiff in which the doctor opined that Plaintiff was permanently disabled by a combination of hepatitis C, irritable bowel syndrome and arrythmia, as well as anxiety and depression. Tr. at 231.  In an accompanying Physician's Statement, Dr. Carabello indicated that she had advised Plaintiff to stop working on January 16, 2007.  Tr. at 232.

On September 12, 2007, Paul Yankelevich, M.D., performed a physical examination of Plaintiff.  Tr. at 247-50.  Dr. Yankelevich noted Plaintiff's chief complaints as allergic rhinitis, hepatitis C, irritable bowel syndrome, acid reflux disease, irregular heartbeat, tendonitis in both wrists, abdominal pain, and neuropathy in both legs. Id. at 247.  Plaintiff's medications were Metoprolol, Zyrtec,[7] Ranitidine (a generic form of Zantac), and Diphenoxylate (a generic form of Lotomil).  Id. at 248.  The doctor observed that Plaintiff was alert, coherent and cooperative.  Id. at 249.  Plaintiff exhibited normal stance and gait, normal heart and abdomen, full range of motion in upper and

---

[7]Zyrtec is indicated for the treatment of allergies and congestion.  PDR 2011 at 1913.

8

lower extremities, and no edema, swelling, tenderness or atrophy of the lower extremities. Id. at 250.

On September 25, 2007, Mary Ryczak, M.D., a state agency consultant, performed a physical RFC assessment of Plaintiff.  Tr. at 252-58.  Dr. Ryczak opined that Plaintiff could perform the requirements of medium exertional work, with limitations to occasional climbing ramps/stairs and balancing, prohibition on climbing ropes, ladders and scaffolds, and avoidance of concentrated exposure to hazards such as machinery and heights.  Id. at 254-55.

On March 11, 2008, an examining psychiatrist from Horizon House described Plaintiff as neat, clean, and well-nourished, and noted that she exhibited normal gait, good eye contact, normal (although "over-inclusive") speech, logical and coherent thought processes, flight of ideas but no hallucinations or suicidal thoughts, good memory, above-average knowledge, fair insight, and good judgment.  Tr. at 294.  Plaintiff demonstrated depressed mood and anxiety attributed to "multiple stressors."  Id. at 295. The psychiatrist described Plaintiff as wearing "very large glasses," exhibiting head tremors, and being "tearful at times."  Id. at 298.  The psychiatrist recommended treatment for outpatient behavioral health, psychiatric evaluation, and medication monitoring.  Id. at 299.

On March 25, 2008, Hilary O'Neill, M.D., an examining psychiatrist at Horizon House, noted that Plaintiff had a history of "increasing depressive symptoms for the past

1 ½ years," although she reported being less depressed over the last month.  Tr. at 300.

Plaintiff appeared goal-directed and exhibited a full range of affect.  Id. at 301.  Dr.

O'Neill opined that "it will be difficult to distinguish whether depression is connected

with the Hep C or not."  Id. at 302.  The psychiatrist diagnosed "Depression NOS" (not

otherwise specified) and assessed Plaintiff with a Global Assessment of Functioning

(GAF) score of 60.[8]  Id. at 303.  Dr. O'Neill recommended no medication at that time, and

bi-weekly therapy.  Id. at 302.

On April 7, 2008, Plaintiff's therapist, Robert Flair, reported that Plaintiff was in

an unstable housing situation.  Tr. at 307.  The therapist opined that Plaintiff's mental

status demonstrated mild to moderate symptoms, with generally good insight.  Id. at 308.

The therapist rated Plaintiff at the highest level in social skills and daily activities.  Id. at

310, 312.

On April 23, 2008, a mental health evaluator at Horizon House noted that Plaintiff

exhibited resiliency and adaptability in coping with her challenges, which included

financial issues, a limited support system, mental illness, and poor physical health.  Tr. at

291.

---

[8]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  DSM IV-TR at 32. A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, conflict with peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000), ("DSM IV-TR") at 34.

**B.**     <u>Plaintiff's Administrative Hearing Process and the ALJ's Opinion</u>

On May 22, 2008, Plaintiff appeared at a pre-hearing conference called by the ALJ for the purpose of informing Plaintiff of her right to have an attorney.  <u>Tr.</u> at 58-67.  No testimony was taken.  Instead, Plaintiff was shown a video explaining her right to have representation at her administrative hearing, and was given a computer disk containing her medical file.  <u>Id.</u> at 62-63.  When Plaintiff explained that she did not have a computer with which to view the disk, the ALJ suggested that she utilize a library or give the disk to an attorney to review.  <u>Id.</u> at 63.  In response to Plaintiff's remarks that her "situation is not good right now" and that she was homeless, the ALJ stated that he would ask for her administrative hearing to be expedited.  <u>Id.</u> at 63-64.  At the end of the pre-hearing conference, Plaintiff asked "Do I have to get a lawyer?"  The ALJ responded: "You do not have to get a lawyer."  <u>Id.</u> at 66.

At Plaintiff's administrative hearing held on July 15, 2008, Plaintiff again appeared without counsel.  <u>Tr.</u> at 27-57.  Plaintiff's statements regarding counsel are somewhat contradictory.  She acknowledged that the ALJ had told her about her right to an attorney, and then stated: "But you also told me I didn't have to have one."  <u>Id.</u> at 30.  Also, although she seemed to acknowledge that a lawyer could not charge a fee unless she won her case, she explained that she did not have an attorney with her because "I can't afford one."  <u>Id.</u>   Plaintiff also appeared to be confused by the role of the VE, stating at the outset of the hearing that "[m]aybe he can testify . . . about my body, too."  <u>Id.</u> at 29.

11

As for her medical records, Plaintiff explained that she did not review the computer disk given to her at the pre-hearing conference because she did not have access to a computer. Id.  The ALJ did not indicate whether he had received treatment notes from Horizon House, stating that he would send for them if they were not in the record.  Id. at 31-32. The ALJ then proceeded with the administrative hearing.

Plaintiff testified that she suffered from a variety of physical problems, including allergic rhinitis, esophageal reflux disease, heart palpitations, cirrhosis,[9] hepatitis C, bridging fibrosis, tendonitis in both wrists, right carpal tunnel syndrome, and irritable bowel syndrome.  Tr. at 36-44.  She testified that she was prescribed pain medication and wore a splint for her carpal tunnel, but stopped because it did not help.  Id. at 43.  Plaintiff also testified that she took Diphenoxylate, a generic form of Lotomil.  Id. at 44.

Plaintiff also testified as to mental problems, for which she was treating with two psychiatrists at Horizon House.  Tr. at 44-45.  She stated that her diagnosis shifted from "bipolar disorder to bipolar level II,"[10] and from "severe depression and anxiety to manic

---

[9]Cirrhosis is defined as "any of a group of chronic diseases of the liver characterized by the loss of normal lobular architecture with fibrosis, and by destruction of [normal] cells and their regeneration to form nodules."  DIMD at 371.

[10]Bipolar disorder, or manic-depressive illness, is more accurately a group of disorders generally characterized by mild, moderate or severe episodes of manic, mixed or major depressive moods.  DSM IV-TR at 382-83.  The essential feature of Bipolar I Disorder is a clinical course characterized by one or more manic or mixed episodes, often with one or more major depressive episodes.  Id. at 382.  The essential feature of Bipolar II Disorder is a clinical course characterized by one or more major depressive episodes with at least one hypomanic episode.  Id. at 392.

depression and anxiety." Id. at 44.  She denied having hallucinations, trying to hurt

herself, or engaging in physical altercations. Id. at 46-47.  She described "really bad

depression and mood swings," as well as trouble sleeping. Id.  She was initially

prescribed Invega,[11] but because it affected her heart, her mental health providers were

talking about the possibility of treating her with Risperdal.[12]

Plaintiff testified that she could walk perhaps half a block without pain, stand for

five-to-ten minutes, and sit in a chair without discomfort for more than an hour. Tr. a 49-

50.  She traveled via public transportation, transported her belongings from the homeless

shelter in a suitcase, and required repeated assistance moving the suitcase up stairs. Id. at

48-51.  She testified that she could not do the lifting of her prior job, and had discomfort

while bending. Id. at 50.

A VE also testified at the administrative hearing. Tr. at 53-55.[13]  The VE testified

that Plaintiff's past job as an accounting clerk is semi-skilled and was performed by her at

---

[11]Invega is indicated for the acute and maintenance treatment of schizophrenia, and for the acute treatment of schizoaffective disorder. PDR 2011 at 2691.

[12]Risperdal is indicated for the treatment of schizophrenia. PDR 2011 at 2742.

[13]As previously noted, Plaintiff expressed confusion as to the role of VE at the start of the administrative hearing. Tr. at 29.  Later, when asked by the ALJ whether she objected to the VE testifying as an expert witness, Plaintiff responded: "Well, how would be – he be an expert witness if he's not in my body or in my brain?" Id. at 53.  When told the VE would be "testifying as an expert with regard to jobs, not about you," Plaintiff responded "I don't see why I'd have any objection." Id.

the medium level,[14] although the job is usually performed at the sedentary level.[15]  Id. at

54-55.  The VE also testified that employers usually allow permanent employees "only

about three days of absence per month at the most."  Id. at 54.  The ALJ did not present

the VE with a hypothetical question, and Plaintiff did not ask the VE any questions,

stating: "I don't really know what I should ask."  Id. at 55.

     In a decision dated October 17, 2008, the ALJ found as follows:

1.    Plaintiff has not engaged in substantial gainful activity since
January 12, 2007.  Tr. at 18.

2.    Plaintiff has the following severe impairments: hepatitis C with
bridging fibrosis.  Id.

3.    Plaintiff does not have an impairment or combination of impairments
that meets or medically equals one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4.  Id. at
19.

4.    Plaintiff has the RFC to perform the full range of work at the
medium exertional level.  Id. at 20.

---

[14]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c), 416.967(c).

[15]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.967(a).

     5.     Plaintiff is capable of performing her past relevant work as an accounting clerk.  Id. at 23.

Thus, the ALJ concluded that Plaintiff was not disabled.  Id. at 23-24.

Plaintiff, now represented by counsel, argues that the decision of the ALJ is not supported by substantial evidence because (1) the ALJ proceeded with Plaintiff's administrative hearing even though she did not knowingly waive her right to an attorney, and (2) the ALJ failed to properly perform his heightened duty to represent Plaintiff and to develop the record.  Defendant responds that the ALJ properly proceeded with the administrative hearing, and that the ALJ's opinion is supported by substantial evidence.

## IV.   <u>DISCUSSION</u>

### A.   <u>Whether Plaintiff Knowingly Waived Her Right to an Attorney</u>

Plaintiff first argues that the decision of the ALJ is not supported by substantial evidence because the ALJ proceeded with Plaintiff's administrative hearing even though Plaintiff did not knowingly waive her right to an attorney.  Doc. 8 at 5-6.  Defendant counters that the ALJ did everything he was obligated to do in this regard, and that the ALJ correctly proceeded with the administrative hearing.  See Doc. 9 at 13-15.

There is no constitutional right to counsel in a Social Security disability hearing. Gauthney v. Shalala, 890 F. Supp. 401, 410 (E.D. Pa. 1995).  However, Social Security claimants have a statutory and regulatory right to have counsel at such a hearing.  See 42 U.S.C. §§ 406(c), 1383(d); 20 C.F.R. §§ 404.1700, 416.900.  A claimant may waive her right to counsel, and lack of counsel alone is not a cause for remand so long as the

claimant knowingly waived the right.  <u>See</u> <u>Comiskey v. Astrue</u>, No. 09-0252, 2010 WL

308979, at *5 (E.D. Pa. Jan. 27, 2010); <u>see</u> <u>also</u> <u>Coven v. Comm'r of Soc. Sec.</u>, No. 10-

10390, 2010 WL 2588258, at *5 (11th Cir. 2010) (ALJ did not err in holding hearing

where claimant knowingly and voluntarily waived right to counsel).

Here, Plaintiff was informed of her right to be represented by an attorney, both in

writing and in-person at the pre-hearing conference.  <u>Tr.</u> at 58-67.  The ALJ stated that he

called the pre-hearing conference to show Plaintiff a video about her right to have an

attorney, and he gave her a list of phone numbers she could use to find an attorney.  <u>Id.</u> at

61-62.  The ALJ also gave Plaintiff a computer disk containing her medical record,

suggesting that she either give the disk to an attorney or review it herself in a library.  <u>Id.</u>

at 63.  When Plaintiff appeared at her subsequent administrative hearing without an

attorney, the following exchange occurred:

> ALJ:   My name is Owen Katzman.  I am a Judge with the Social Security
> Administration.  And we're here today to provide a new and
> independent hearing in your application for Social Security benefits.
> I'm going to rely today on the testimony that you will give and on the
> testimony of Mr. Martin over here.  He is a vocational expert and can
> testify about jobs.
>
> [PL]:   Maybe he can testify –
>
> ALJ:   I will also –
>
> [PL]:   – about my body, too.
>
> ALJ:   I will also rely on the evidence that's in this – in the electronic
> exhibit file, okay?

[PL]:   I've never seen it.

ALJ:   When you were here a couple of months ago we gave you a computer disk didn't we?

[PL]:   I know, but I don't have access to a computer anywhere.

ALJ:   Well, the – there – there are computers in most libraries.

[PL]:   Okay.

ALJ:   And all you have to do is take it to a library and pop it into a computer and I think I probably said that at the time.

[PL]:   Right.

ALJ:   So also you've shown up today without a lawyer.  At the last hearing we told you about your right to an attorney.

[PL]:   Yes.

ALJ:   And we said that –

[PL]:   Yes.  But you also told me I didn't have to have one.

ALJ:   I told you the decision was up to you whether you got one or not.

[PL]:   Right.

ALJ:   And you showed up today without a lawyer and that's okay.

[PL]:   I can't afford one.

ALJ:   Well, as you saw in that video a lawyer can't charge you a fee unless you win your case.

[PL]:   Right.

> ALJ:   Okay.  And that's what was said in the video and – and that's probably what I said at the last hearing.  So we're going to go ahead without a lawyer. . . .

Tr. at 29-30.  As previously noted, the ALJ proceeded to take testimony from Plaintiff and the VE, although the ALJ did not present a hypothetical question to the VE, nor did Plaintiff ask the VE any questions.

There is no question that the Commissioner attempted to convey to Plaintiff her right to have an attorney at the administrative hearing.  However, it is less clear that Plaintiff knowingly waived her right to have counsel.  Despite viewing a videotape at the pre-hearing conference, Plaintiff exhibited obvious confusion about whether she needed an attorney, and whether and when such an attorney would be paid, and there is no evidence that she ever appreciated the value of reviewing her file or the purpose of the VE, let alone the possible need to cross-examine the VE.  Moreover, although Plaintiff also received written notices of her right to counsel, there is no way to know whether Plaintiff understood the written notices any more than she understood the videotape or the ALJ's explanations at the pre-hearing conference or at the start of the administrative hearing.

During the administrative hearing, Plaintiff testified as to ongoing mental health treatment documented in records the ALJ did not then possess.  Under the circumstances, there is no way to determine whether Plaintiff's evident confusion was attributable to her ongoing mental health issues, and therefore no way to determine whether Plaintiff's

decision to waive her right to counsel was knowing and voluntary.  I need not reach a final conclusion on this issue, however, because the matter must be remanded on a related ground as discussed in the next section.  Also, Plaintiff is now represented by counsel, and this issue will thus be moot on remand.

### B.   Whether the ALJ Properly Performed His Heightened Duty to Represent Plaintiff and Develop the Record

Plaintiff also argues that the ALJ failed to properly perform his heightened duty to represent Plaintiff and to develop the record.  "The proceedings for disability benefits dictates extra care on the part of the agency in developing an administrative record and in explicitly weighing all evidence." Dobrowolsky v. Califano, 606 F.2d 403, 407 at n.13 (3d Cir. 1979).  A hearing on an application for benefits is not adversarial in nature; rather the Social Security Administration assists an applicant in proving his claim.  Id. (citing Hess v. Sec'y of HEW, 497 F.2d 837 (3d Cir. 1974)); see also Sims v. Apfel, 530 U.S. 103, 111 (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.").  An ALJ has a heightened level of care and responsibility to assume a more active role when the claimant is unrepresented. Id. (citing Gachette v. Weinberger, 551 F.2d 39, 41 (3d Cir. 1977)).  "Although lack of counsel alone is not cause for remand when the claimant knowingly has waived the right to counsel, remand is appropriate when the lack of counsel prejudices the claimant or causes unfairness at administrative level, such as when the ALJ fails to adequately develop the administrative record." Comiskey, 2010 WL 308979, at *5 (citing Livingston

v. Califano, 614 F.2d 342, 345 (3d Cir. 1980)).  Finally, the Third Circuit has held that the ALJ has a duty to develop the record "when there is a suggestion of mental impairment by inquiring into the present status of impairment and its possible effects on the claimant's ability to work."  Plummer, 186 F.3d at 434.

Although Plaintiff did not list a mental impairment in her application for benefits, she clearly raised the issue in her testimony at the administrative hearing when she testified that psychiatrists from Horizon House had diagnosed her with bipolar disorder, depression and anxiety.  Tr. at 44-45.  The ALJ asked only superficial questions about Plaintiff's mental health problems, such as what her sleeping habits where and whether she hallucinated or ever hurt herself or others.  Id. at 46-47.  The ALJ did not inquire as to any other symptoms of bipolar disorder, nor did he ask about her anxiety.  Although the ALJ obtained records from Horizon House subsequent to the administrative hearing, the fact that those records were not in his possession at the time of the hearing may have contributed to his decision not to inquire further in this regard, or to include any mental health-related limitations in a hypothetical to the VE.  In addition, the ALJ did not obtain psychiatric records from Glenside Inn, even though Plaintiff testified that she spent three or four days there in 2008 because "[m]y mental condition really wasn't good" and what they do is "keep you in house and they make sure you get your medication and whatnot." Id. at 47-48.

The lack of a complete record as to Plaintiff's mental health history is significant in light of how the ALJ addressed Plaintiff's mental disorders.  The ALJ did not find any mental health issue to be severe at step two and did not consider mental health issues at any of the subsequent steps of the five-step evaluation, in part because it was unclear whether Plaintiff's depression was connected to hepatitis C, and also because "[t]he condition was not diagnosed until March 2008."  Tr. at 18-19.  The ALJ's approach is problematic for a number of reasons.  First, whether Plaintiff's depression is related to her hepatitis C or is caused by other factors is not particularly relevant to whether the depression results in functional limitations.  Second, the ALJ failed to mention bipolar disorder or anxiety, which are separate mental health diagnoses supported by the record.  Third, the statement that Plaintiff's depression was first diagnosed in March 2008 is incorrect.  Dr. Carabello, Plaintiff's treating physician, diagnosed Plaintiff with depression and anxiety repeatedly beginning in October 2006, see id. at 215, 217 & 231, and Dr. Navarro listed a history of depression in his letter to Dr. Carabello dated March 22, 2007.  Id. at 200.  Fourth, the ALJ failed to follow the special technique for evaluating mental impairments set forth in the Social Security regulations.  See 20 C.F.R. §§ 404.1520a, 416.920a.  Finally, the ALJ's conclusion that Plaintiff's depression is non-severe at step two is inconsistent with the only GAF score on record (60) which indicates the presence of "moderate" symptoms and "moderate" difficulty in social and

occupational functioning, which in turn suggests at least some impact on Plaintiff's ability to work.

Similarly, the ALJ's failure to obtain any expert report or testimony on limitations caused by hepatitis C with bridging fibrosis is significant because it was the only impairment the ALJ found to be severe.  Tr. at 18.  In his summary of Plaintiff's medical evidence, the ALJ noted doctors' assessments of Plaintiff's hepatitis C with bridging fibrosis as "stage 3-4" and as "advanced," and found "no overt evidence of advanced liver disease."  Id. at 22.  However, absent expert testimony on the condition, it is unclear what limitations could result from this stage of the disease, and whether bridging fibrosis worsens the symptoms, limitations and/or prognosis of patients diagnosed with advanced hepatitis C.  In this regard, it is significant that Plaintiff's treating physicians recommended treatment with Interferon and other medications, but held off doing so in light of Plaintiff's history of depression.  Id. at 22, 200.

Finally, the ALJ did not present the VE with any hypothetical questions, even though limitations were found by a non-examining consultative physician whose RFC assessment the ALJ adopted in his opinion.  Tr. at 23, 254-55.  An ALJ is not required to seek the testimony of a VE at step four of the five-step sequential evaluation.  Mullin v. Apfel, 79 F. Supp. 2d 544, 549 (E.D. Pa. 2000).  "Although [VE] testimony is not needed at step four, it may be considered when the ALJ is determining whether the claimant is capable of performing past relevant work . . . ."  Coryea v. Comm'r of Soc. Sec., 07-1210,

2008 WL 4279809, at *11 (E.D. Pa. Sept. 16, 2005) (citing Rivera v. Barnhart, 239 F.

Supp. 2d 413, 421 (D. Del. 2002)).  Here, as previously discussed, the ALJ owed pro se

Plaintiff a heightened level of care and responsibility.  Having chosen to obtain VE

testimony, the ALJ could have alerted Plaintiff to the VE's role at the administrative

hearing by, for example, asking a hypothetical question which incorporated limitations

found by the ALJ.  Moreover, although the ALJ asked the VE how many absences per

month most employers would tolerate, he did not link the question to any of Plaintiff's

alleged impairments or limitations, nor did he pose any questions to the VE which

incorporated limitations consistent with Plaintiff's testimony during the administrative

hearing.  Id. at 54.  When the ALJ asked Plaintiff if she would like to ask him any

questions, Plaintiff replied: "Not really.  I don't really know what I should ask."  Id. at 55.

Under these circumstances, I conclude that the ALJ's reliance on the VE's testimony both

violated his duty to represent Plaintiff and prejudiced her ability to obtain a fair

administrative hearing, requiring remand.  See Comiskey, 2010 WL 308979, at *5.

In sum, I find the ALJ failed to properly perform his heightened duty to represent

Plaintiff and to develop the record by, for example, failing to obtain expert medical

testimony regarding limitations caused by hepatitis C and bridging fibrosis, failing to

develop a mental health technique, and failing to present the VE with any hypothetical

question containing any limitations whatsoever.  Plaintiff is now represented by counsel,

who will presumably request appropriate additions to the record.  Upon remand, the ALJ

23

should obtain expert medical opinion incorporating all relevant physical and psychiatric evidence,  reformulate Plaintiff's RFC assessment in light of all limitations supported by the record, and obtain additional VE testimony based on the new assessment.

V.     **CONCLUSION**

Plaintiff's testimony from the pre-hearing conference and administrative hearing strongly suggests that Plaintiff did not knowingly waive her right to counsel, and even if she had, the ALJ failed to properly perform his heightened duty to represent Plaintiff and to develop the record, particularly in light of Plaintiff's mental impairment.  Upon remand, the ALJ should obtain expert medical opinion incorporating all relevant physical and psychiatric evidence, reformulate Plaintiff's RFC assessment in light of all limitations supported by the record, and obtain additional VE testimony based on the new assessment.

Therefore, I make the following:

## <u>R E C O M M E N D A T I O N</u>

AND NOW, this     24th        day of August 2011, it is RESPECTFULLY

RECOMMENDED that the case be remanded to the Commissioner pursuant to sentence

four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report, Judgment

be entered REVERSING the decision of the Commissioner of Social Security for the

purposes of this remand only, and the relief sought by Plaintiff be GRANTED to the

extent that the matter be REMANDED for further proceedings consistent with this

adjudication.  The Parties may file objections to this Report and Recommendation.  <u>See</u>

Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any

appellate rights.


                    BY THE COURT:

                    /S/ELIZABETH T. HEY

                    _____

                    ELIZABETH T. HEY
                    UNITED STATES MAGISTRATE JUDGE